# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**IVAN EUBANKS**                                  **CIVIL ACTION**

**VERSUS**                                           **NO. 17-1217**

**SASKIA O. EUBANKS**                      **SECTION: "E" (1)**

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Before the Court is Petitioner Ivan Eubanks' Verified Complaint for Return of Children to Cayman Islands.[1] Mr. Eubanks' case arises pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Convention").[2] Mr. Eubanks claims that Respondent, Ms. Eubanks, wrongfully removed E.E. and P.E. from the Cayman Islands and is wrongfully retaining them in the United States, in violation of the Convention. As relief, he seeks the immediate return of E.E and P.E. to the Cayman Islands.

This matter was tried before the Court, sitting without a jury, on May 11th and May 12th of 2017, on the claims of Ivan Eubanks against Saskia O. Eubanks.[3] Having considered the evidence admitted at trial and the arguments of counsel, the Court announces its Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent a finding of fact constitutes a conclusion of law, the Court adopts it as such. To the extent a conclusion of law constitutes a finding of fact, the Court adopts it as such.

---

[1] R. Doc. 1.
[2] T.I.A.S. No. 11670, 19 I.L.M. 1501, *codified by* the International Child Abduction Remedies Act (hereinafter "ICARA"), 42 U.S.C. §§ 11601, *et seq.*
[3] R. Docs. 96, 97.

After due consideration and for the reasons that follow, the Court is of the opinion that Mr. Eubanks' request for the return of the children should be **DENIED**.

## FINDINGS OF FACT

### I. JURISDICTION

1. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this matter arises under the Convention and ICARA, the implementing legislation. Pursuant to ICARA, state and federal district courts have concurrent original jurisdiction over actions arising under the Convention. [4] A Hague petitioner, however, is "free to choose between state or federal court." [5] Venue is proper because the Court "is authorized to exercise its jurisdiction in the place where the child[ren] [are] located at the time the petition is filed," which was the Parish of Orleans, Louisiana, within the jurisdiction of the United States District Court for the Eastern District of Louisiana. [6]

### II. CREDIBILITY OF WITNESSES

In Hague Convention cases, such as the one before this Court, in which the Court's determination of the children's habitual residence turns on the intention of the parents, the district court often "face[s] . . . a choice as to whom it [finds] more believable." [7] During the bench trial of this matter, the Court had the opportunity to observe the demeanor of Mr. and Ms. Eubanks and to hear their testimony and, on that basis, assess their

---

[4] 42 U.S.C. § 11603(a).

[5] *Yang v. Tsui*, 416 F.3d 199, 203 (3d Cir. 2005).

[6] *See* 42 U.S.C. § 11603(b).

[7] *Padilla v. Troxell*, 850 F.3d 168, 177 (4th Cir. 2017) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1069 (6th Cir. 1996) (alterations in original)). *See also Vasquez v. Vasquez*, 2013 WL 7045041 (N.D. Tex. Aug. 27, 2013); *Application of Ponath*, 829 F. Supp. 363 (D. Utah 1993); *Fuentes-Rangel v. Woodman*, 2014 WL 12656211 (N.D. Ga. May 6, 2014).

credibility. As explained below, the Court has found Ms. Eubanks to be the more credible witness, and, therefore, gives more weight to her testimony in its finding of fact.

Prior to trial, Ms. Eubanks, in her Interrogatories and Requests for Production of Documents dated March 3, 2017, asked Mr. Eubanks to produce: ". . . each and every email or other correspondence between you and any prospective employer from January 1, 2015, to present, including the Curriculum Vitae(s) sent" and for Mr. Eubanks to:

> [I]dentify each and every individual or entity you have contacted for purposes of obtaining employment since January 1, 2015. For each, please state the date(s) of contact, the type of contact, outcomes of said contact, the name of any entity contacted, including the name of any individual contacted with that entity, and a description of any representations made by you to that entity regarding your qualifications and when you have been able to start such job opportunity.[8]

Ms. Eubanks' Interrogatories and Requests for Production were clearly not limited to only applications *submitted* during this time period but also covered *any* correspondence between Mr. Eubanks and a prospective employer. Mr. Eubanks' response to the requests for production and his responses to the interrogatories do not include the names of any individuals or entities he corresponded with regarding employment during 2016 or 2017 or copies of correspondence between himself and any prospective employer during 2016 or 2017.[9] Because of the expedited nature of this type of proceeding, the discovery period before trial was truncated, and Ms. Eubanks did not have a full opportunity to conduct discovery.[10]

---

[8] R. Doc. 117-3 (Ms. Eubanks' Interrogatories and Requests for Production of Documents).

[9] *See* R. Doc. 99-2 at 4-12. Mr. Eubanks sent three rounds of responses to Ms. Eubanks' requests for production of documents. *See* R. Doc. 117-3 at 1. Mr. Eubanks' first response was sent on March 10, 2017 and was followed with supplementary responses on March 17, 2017 and April 6, 2017. *Id.* at 2-41. Ms. Eubanks' second motion to continue was based largely on Mr. Eubanks' failure to comply with the Court imposed discovery deadlines. *See* R. Doc. 48-7.

[10] The Court, against Mr. Eubanks' opposition, granted two continuances in this matter. *See* R. Docs. 28, 58. Ms. Eubanks' second motion to continue was granted in part because of Plaintiff's failure to comply with Court imposed discovery deadlines.

On the first day of trial, Mr. Eubanks testified on direct that he did not apply for any jobs during 2016. On cross-examination, Mr. Eubanks admitted that he applied for a job with the United States Department of State in March 2016.[11] At the conclusion of the first day of trial, the Court ordered Mr. Eubanks to perform another search for any emails responsive to Ms. Eubanks' request, specifically, for any correspondence between Mr. Eubanks and any prospective employer from January 1, 2016 through that date. The next morning Mr. Eubanks produced three documents: (1) an email he received on January 5, 2016 from the University of San Diego, setting up a follow-up Skype interview; (2) an email he received from the University of San Diego on January 18, 2016 mentioning that the follow-up interview occurred the week before and notifying Mr. Eubanks that he had not been chosen for the applied to position; and (3) a letter, dated June 10, 2016, stating that the University College of the Cayman Islands, Mr. Eubanks' current employer, was offering him the position of Acting Dean of Academic Affairs. Mr. Eubanks offered no explanation for his earlier failure to produce these emails and information in response to Ms. Eubanks' Interrogatories and Requests for Production.

At the end of the second day of trial, after the Court questioned Mr. Eubanks' counsel regarding the method used to identify Mr. Eubanks' responsive correspondence, it became clear that Mr. Eubanks had performed the search of his emails himself and that neither his attorneys nor a professional third-party vendor had supervised or assisted Mr. Eubanks in his search. The Court ordered Mr. Eubanks to retain a third-party vendor to perform a complete search of his emails to identify any correspondence with potential

---

[11] *See* R. Doc. 117-3 at 44.

employers during 2016.[12] The Court held the record open for the introduction into evidence of these emails and filing of post-trial briefs.[13]

On June 13, 2017, pursuant to the Court's Order, the third-party vendor hired by Mr. Eubanks to perform this search produced over 1,800 emails to the Court and Ms. Eubanks that were responsive to the discovery requests.[14] Included in those 1,800 emails are countless communications between Mr. Eubanks and potential employers during 2016 that had not been previously produced in response to discovery requests, or by Mr. Eubanks at the direction of the Court at the end of the first day of trial.

These emails directly refute Mr. Eubanks' testimony that he did not continue to seek employment in the United States after moving to the Cayman Islands in early January 2016. They also refute his testimony that he had no correspondence regarding employment after January 1, 2016. Mr. Eubanks can blame only himself for his loss of credibility. For example, on January 13, 2016, Mr. Eubanks received an email from Georgia Southern University expressing an interest in conducting a telephone interview with him regarding his application for the position of Assistant Professor Writing and Linguistics with Specialty in Assessment. On January 16, 2016, Mr. Eubanks sent his response in which he stated, "I am most pleased and excited to participate in a telephone interview." According to the emails, it appears a telephone interview was held on January 21, 2016. On March 5, 2016, Mr. Eubanks received an email from Northwestern State

[12] R. Doc. 97.
[13] R. Docs. 99, 100, 111, 114. The record is now closed.
[14] The emails produced on June 13, 2017, which include those produced on May 12, 2017 regarding Mr. Eubanks' application for a position at the University of San Diego, are admitted into evidence as Court Exhibit 2 (manual attachment). Emails regarding Mr. Eubanks' application with the State Department, discussed in greater detail below, are admitted into evidence under seal as Court Exhibit 3 and also may be found on the record under seal. *See* Docs. 111-3, 111-4, 111-5. The June 10, 2016 letter stating that Mr. Eubanks had been offered the position as Acting Dean of Academic Affairs at the University College of the Cayman Islands, produced on May 12, 2017 is also admitted into evidence as Court Exhibit 4.

University, in Natchitoches, Louisiana, stating that the search committee for the department head in English, Foreign Languages and Cultural Studies was ready to move forward with online interviews with the remaining candidates and inquiring as to whether Mr. Eubanks was still interested in the position. On that same date, Mr. Eubanks responded, "I am still very interested in the position as department head . . . and I'm pleased to be invited for an interview." An online interview occurred on March 16, 2016. On April 8, 2017, Mr. Eubanks received another email from the search committee at Northwestern State University stating that the committee was interested in bringing him to campus for an in-person interview. The next day, Mr. Eubanks responded stating, "I'm thrilled that the search committee would like to hold a second interview with me . . ." Further, included in the emails are numerous rejection letters in response to Mr. Eubanks' "recent application."[15]

In addition, the Court, at the end of the second day of trial, also ordered that Mr. Eubanks produce emails regarding his application for a position as a Regional English Language Officer (RELO) with the State Department.[16] To expedite production, these emails were produced on June 5, 2017 under an agreed protective order. The produced emails corroborate Ms. Eubanks' testimony that Mr. Eubanks was very actively pursuing a position with the State Department from January of 2016 to August of 2016. In fact, despite testifying at trial that he was happy with his job in the Cayman Islands and was

_____

[15] Court Ex. 3. Some of the rejection emails are as late as August 5, 2016. Mr. Eubanks did not testify that he applied to all of these positions in 2015. It seems reasonable to conclude that Mr. Eubanks applied for at least some of these positions after January 1, 2016. In fact, Mr. Eubanks testified he applied for a job with the State Department in March of 2016. Testimony of Ivan Eubanks.
[16] *See* R. Doc. 97 at 2. The Court memorialized the parties' agreement to enter into a protective order within two weeks so that Mr. Eubanks could produce the emails related to his state department applications under a protective order. The emails regarding his application for a position with the State Department mentioned herein are filed on the record under seal. *See* R. Docs. 111-3, 111-4, 111-5.

not applying for other jobs, the emails show that Mr. Eubanks was corresponding with employees at the State Department regarding his pending application both shortly before and after the trial in this matter.[17]

The Court makes its findings of fact below with this credibility finding in mind.

### III.   FINDINGS OF FACT – HABITUAL RESIDENCE

1. E.E. and P.E. are the only children of Mr. and Ms. Eubanks. The parties are both American Citizens.[18]

2. The parties were married on December 1, 2007, in the Parish of Orleans, Louisiana.[19]

3. In 2008, the parties moved to Boston, Massachusetts after Mr. Eubanks accepted a teaching position at Boston University.[20]

4. E.E. and P.E. were born on April 18, 2013 in Boston, Massachusetts.[21]

5. E.E. and P.E. are United States citizens.[22]

6. Mr. Eubanks has a Ph.D. in Russian and Slavic Languages.[23]

7. Shortly after the birth of E.E. and P.E., Mr. Eubanks secured a job as a professor in Moscow, Russia. Mr. Eubanks moved to Moscow in August of 2013. Ms. Eubanks and the two children followed in October of 2013.[24]

---

[17] The Court is unaware of whether he has been hired by the State Department as of this date.
[18] Testimony of Ivan Eubanks and Saskia O. Eubanks.
[19] *Id.*
[20] Testimony of Ivan Eubanks, Carolyn DeLoache, Saskia O. Eubanks.
[21] Testimony of Ivan Eubanks and Saskia O. Eubanks.
[22] Testimony of Saskia O. Eubanks. The Court is also in possession of E.E.'s and P.E.'s passports which reflect that they are citizens of the United States.
[23] Testimony of Ivan Eubanks and Saskia O. Eubanks.
[24] *Id.*

8. When they moved to Russia, the parties decided not to bring all of their personal belongings and instead stored personal items in a storage unit in New Orleans, Louisiana.[25]

9. The parties lived in Moscow for almost three years.[26]

10. While in Russia, Mr. Eubanks applied for over ninety different jobs, almost all of which were teaching positions in the United States. At some point prior to January 2016, Mr. Eubanks, having not yet received an offer of employment in the United States, accepted a position teaching freshman English at the University College of the Cayman Islands.[27]

11. Mr. Eubanks' teaching contract with the University College of the Cayman Islands was for two-years but the only penalty for leaving before the end of the term of the contract was that the school would not pay for the family's move off the island.[28]

12. Mr. Eubanks told Ms. Eubanks that the move to the Cayman Islands would be a temporary move for the duration of one semester, until he received a position in the United States. Ms. Eubanks agreed to the move because the parties were desperate to leave Russia and because Mr. Eubanks promised their stay in the Cayman Islands was to be temporary and that it would provide an opportunity for them to decompress after leaving Russia. Mr. Eubanks specifically told Ms. Eubanks that he was 100 percent positive he would be offered a teaching position at the University of San Diego by the end of the semester.[29]

---

[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] Testimony of Saskia O. Eubanks.
[29] *Id.* Mr. Eubanks' mother, Carolyn DeLoache, also testified that the parties told her they were moving to the Cayman Islands until Mr. Eubanks was offered another job. Testimony of Carolyn DeLoache.

13. The parties moved from Moscow, Russia to the Cayman Islands on or about January 1, 2016.[30]

14. E.E. and P.E. lived in the Cayman Islands, with both Mr. and Ms. Eubanks, from January 1, 2016 until August 26, 2016.[31]

15. Neither Mr. Eubanks nor Ms. Eubanks has any relatives residing in the Cayman Islands.[32]

16. Mr. Eubanks did not change the mailing address on his credit cards or bank statements to the Cayman Islands and, instead, they are mailed to his father's address in South Carolina.[33]

17. Mr. Eubanks is registered to vote in Florida.[34]

18. The parties rented a furnished condominium in the Cayman Islands and continued to store their personal belongings in their storage facility in New Orleans, Louisiana. The lease agreement for the condominium contained, at the parties' request, an "escape clause" allowing the parties to break to break the lease, without penalty, at any time prior to May 31, 2016.[35]

19. The escape clause was included in the lease so that the parties could break the lease if Mr. Eubanks received an offer to work in the United States.[36]

---

[30] Testimony of Ivan Eubanks and Saskia O. Eubanks.
[31] *Id.*
[32] Testimony of Saskia O. Eubanks.
[33] Testimony of Ivan Eubanks.
[34] *Id.*
[35] Testimony of Ivan Eubanks and Saskia O. Eubanks. *See also* Trial Ex. 3 ("The tenants shall have the right to a break clause which will come into effect if written notice to action break clause is given before the 31st May 2016, therefore break clause would allow tenant to vacate 30th June 2016.").
[36] Testimony of Saskia O. Eubanks.

20. Shortly after moving to the Cayman Islands and participating in a Skype interview, Mr. Eubanks learned on January 18 that he was not chosen for the teaching position at the University of San Diego.[37]

21. After learning he did not get the job at the University of San Diego, Mr. Eubanks assured Ms. Eubanks his chances of getting hired by the State Department were good.[38]

22. In June 2016, Mr. Eubanks accepted a position as Acting Dean of Academic Affairs with his current employer, the University College of the Cayman Islands.[39] Mr. Eubanks told Ms. Eubanks that accepting this position would make him a more desirable applicant in his job search.[40]

23. After Mr. Eubanks accepted the position as Acting Dean of Academic Affairs, the parties, in order to reduce their monthly expenses, attempted to identify a waterfront home to use as their residence, but which could be used as a rental property or be easily sold when they left the Cayman Islands. Ultimately, however, the parties did not find a property they could agree fit their criteria for an investment.[41]

24. E.E. and P.E. were registered but had not started school in the Cayman Islands as of August 26, 2016.[42]

25. Both Mr. Eubanks and Ms. Eubanks wanted E.E. and P.E. to be raised and educated in the United States.[43]

---

[37] Testimony of Ivan Eubanks and Saskia O. Eubanks.
[38] Testimony of Saskia O. Eubanks.
[39] Testimony of Ivan Eubanks; Court Ex. 4.
[40] Testimony of Saskia O. Eubanks.
[41] *Id.*
[42] Testimony of Ivan Eubanks and Saskia O. Eubanks.
[43] Testimony of Saskia O. Eubanks.

26. From the time of arrival in the Cayman Islands to the date of this trial, Mr. Eubanks actively sought employment in the United States.[44]

27. Ms. Eubanks did not intend for the children's habitual residence to be in the Cayman Islands.[45]

28. Ms. Eubanks removed E.E. and P.E. from the Cayman Islands to New Orleans, Louisiana on August 26, 2016, without the consent of Mr. Eubanks.[46]

29. E.E and P.E. continue to reside in New Orleans, Louisiana with Ms. Eubanks.[47]

30. On February 10, 2017, Mr. Eubanks filed his Verified Complaint for the Return of Children to the Cayman Islands.[48]

## IV. CONCLUSIONS OF LAW

### 1. THE HAGUE CONVENTION: BACKGROUND

The Convention was adopted in 1980 in response to the emerging problem of international child abductions perpetrated by parents, guardians, and close family members.[49] The Convention specifically was adopted to address "the problem of international child abductions during domestic disputes."[50] "The Convention seeks 'to secure the prompt return of children wrongfully removed to or retained in any Contracting State,' and 'to ensure that rights of custody and of access under the laws of one Contracting State are effectively respected in the other Contracting States.'"[51] Further, the drafters of the Convention sought to "discourage forum shopping in

---

[44] *Id. See also* Court Ex. 2; R. Docs. 111-3, 111-4, 111-5.
[45] Testimony of Saskia O. Eubanks.
[46] Testimony of Ivan Eubanks and Saskia O. Eubanks.
[47] *Id.*
[48] R. Doc. 1.
[49] *Mozes v. Mozes*, 239 F.3d 1067, 1069-70 (9th Cir. 2001).
[50] *Abbott v. Abbott*, 560 U.S. 1, 8 (2001).
[51] *Id.* (quoting Art. 1, S. Treaty Doc. No. 99-11, at 7 (herein after "Treaty Doc.")).

international child-custody disputes when it takes the form of removing a child to the jurisdiction preferred by one of the parents."[52]

The Convention's stated purpose is "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence . . ."[53] "The Convention was designed to 'restore the pre-abduction status quo.'"[54] The Explanatory Report to the Convention instructs:

> [F]rom the Convention's standpoint, the removal of a child by one [parent with custody] without the consent of the other, is . . . wrongful, and this wrongfulness derives . . . from the fact that such action has disregarded the rights of the other parent which are also protected by law, and has interfered with their normal exercise . . . *[The Convention] is not concerned with establishing the person to whom custody of the child will belong at some point in the future . . . it seeks, more simply to prevent a later decision on the matter being influenced by a change of circumstances brought about through unilateral action by one of the parties.*[55]

At the core of these procedures is the Convention's return remedy: when a child under the age of sixteen has been wrongfully removed from, or retained outside of, the country of his or her habitual residence, the country to which the child has been brought must "order the return of the child forthwith," unless certain exceptions, or affirmative defenses, apply.[56]

"In 1988, Congress enacted ICARA, the legislation implementing the Convention in this country."[57] The provisions of ICARA "are in addition to and not in lieu of the

---

[52] *Kijowska v. Haines*, 463 F.3d 583, 589 (7th Cir. 2006) (citations omitted).
[53] *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 344 (5th Cir. 2004) (quoting Convention, Preamble).
[54] *Id.* (quoting *Friedrich*, 78 F.3d at 1064).
[55] *Id.* at (alterations and emphasis in original) (quoting Elisa Perez-Vera, *Explanatory Report: Hague Convention on Private International Law*, ¶ 71, at 447-48 (hereinafter "Explanatory Report"). In *Sealed Appellant*, the Fifth Circuit explained, "The Explanatory report is recognized as the official history, commentary, and source of background on the meaning of the provisions of the Convention." *Id.* at 343 (citing Pub. Notice 957, 51 Fed. Reg. at 10503).
[56] *Abbott*, 560 U.S. at 8 (citing Convention, arts. 4, 12).
[57] *Saldivar v. Rodela*, 879 F. Supp. 2d. 610, 616 (W.D. Tex. 2010).

provisions of the Convention."[58] Under ICARA, anyone seeking the return of a child allegedly wrongfully removed to or retained in the United States may commence a civil action in any court that has jurisdiction over the action and the place where the child is located.[59] Once such an action is filed, the 'court in which [the] action is brought . . . shall decide the case in accordance with the Convention."[60] "Though the Convention is silent with regard to burdens and standards of proof, ICARA provides that the petitioner seeking the return remedy has the burden of proving by a preponderance of the evidence that 'the child has been wrongfully removed or retained within the meaning of the Convention."[61]

As the Fifth Circuit explained in *Larbie v. Larbie*:

The Convention uses the phrases "wrongful removal or retention" and "right of custody" as terms of art. A removal or retention is "wrongful" under the Convention when (1) "it is in breach of rights of custody attributed to a person ... under the law of the State in which the child was habitually resident immediately before the removal or retention; and" (2) "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention."[62] The Convention considers "rights of custody [to] include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence."[63] These rights differ from "rights of access," which "include the right to take a child for a limited period of time to a place other than the child's habitual residence."[64]

As explained by the Ninth Circuit in *Mozes v. Mozes*:

A court applying this provision must therefore answer a series of four questions: (1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence?

---

[58] 42 U.S.C. § 11601(b)(2).
[59] *Id.* at § 11603(b).
[60] *Id.* at § 11603(d).
[61] *Saldivar*, 879 F. Supp. 2d. at 617 (quoting 42 U.S.C. § 11603(e)(1)(A)).
[62] *Larbie v. Larbie*, 690 F.3d 295, 307 (quoting Convention art. 3).
[63] *Id.* (quoting Convention art. 5(a)).
[64] *Id.* (quoting Convention art. 5(b)).

(4) Was the petitioner exercising those rights at the time of the removal or retention?[65]

It is the petitioner's burden to establish these elements by a preponderance of the evidence.[66] Accordingly, to establish a prima facie entitlement to the return remedy, Mr. Eubanks must show by a preponderance of the evidence that (1) the Cayman Islands was E.E. and P.E.'s habitual residence immediately before Ms. Eubanks removed them to the United States; (2) he has "rights of custody" under the law of the habitual residence; and (3) he was exercising his custody rights at the time Ms. Eubanks removed the children.[67] Under the Convention, courts in contracting countries must return a wrongfully-removed child to his country of habitual residence unless a narrow exception applies.[68]

## 2. THE CHILDREN'S HABITUAL RESIDENCE

At the threshold, in an action pursuant to the Hague Convention, the Court must determine whether the child was habitually resident in any country prior to the alleged wrongful removal or retention, and, if so, which country.[69] Because Mr. Eubanks is

---

[65] *Mozes*, 299 F.3d at 1070.

[66] 42 U.S.C. § 11603(e)(1). *See also Larbie*, 690 F.3d at 307. In *Larbie*, the Fifth Circuit stated, "The Convention inquiry, then, consists of three elements, which the petitioner must establish by a preponderance of the evidence. First, that the petitioner must show that the respondent removed or retained the child somewhere other than the child's habitual residence. If so, the question becomes whether the removal or retention violated the petitioner's "rights of custody" under the habitual-residence nation's laws. . . Assuming that the petitioner has rights of custody, she then need only to make the final, and 'relatively easy,' showing that 'at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.'" *Id.* (internal citations omitted). The Fifth Circuit's articulation of the elements of a petitioner's case implicitly includes a requirement that the child be a habitual resident in the country at issue immediately prior to the time of removal.

[67] *See* Convent art. 3; 42 U.S.C. § 11603(e)(1)(A); *Saldivar*, 879 F. Supp. 2d at 618. It is not contested that Mr. Eubanks had, and was exercising, "rights of custody" at the time Ms. Eubanks removed the children from the Cayman Islands.

[68] Convention, art. 12; 42 U.S.C. § 11601(a)(4). One of the exceptions, provided in Article 13b of the Convention, allows a court to decline to return a child a to his or her habitual residence if the respondent can establish, by clear and convincing evidence, that there is a grave risk that the child's return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation. *See Acosta v. Acosta*, 725 F.3d 868, 875 (8th Cir. 2013) (internal quotations omitted) (citing 42 U.S.C. § 11603(e)(2)(A); Convention, art. 13b.

[69] *See Mozes*, 239 F.3d at 1072 ("'Habitual residence' is the central—often outcome-determinative—concept." (citations omitted)).

requesting that the children be returned to the Cayman Islands, it is Mr. Eubanks' burden to prove by a preponderance of the evidence that the children, at the time they were removed by their mother, were habitually resident in the Cayman Islands. [70] The Convention does not define the term "habitual residence." Instead, the term is to be interpreted according to the ordinary and natural meaning of the two words. [71] "The inquiry into a child's habitual residence is not formulaic; rather it is a fact-intensive determination that necessarily varies with the circumstances of each case." [72] "At core, however, the inquiry balances the interests of the child, who is the ultimate focus of the Convention, and the intentions of its parents, who usually effect the removal or retention giving rise to a Convention petition." [73]

Although Courts use varying approaches, each placing different emphasis on the weight given to the parents' intentions to determine a child's habitual residence, the Fifth Circuit, in *Larbie*, explicitly joined the majority of circuits in adopting "an approach that begins with the parents' shared intent or settled purpose regarding their child's residence." [74] "This approach does not ignore the child's experience, but rather gives greater weight to the parents' subjective intentions relative to the child's age." [75] The Fifth

---

[70] *See, e.g., id.* at 1070.

[71] *See Labrie*, 690 F.3d at 310 ("[A]lthough the term 'habitual residence' appears throughout the various Hague Conventions, none of them defines it." (alteration in original) (quoting *Mozes*, 239 F.3d at 1071)).

[72] *Id.* (quoting *Whiting*, 391 F.3d at 546 (omitting citations)). Although the Convention requires that the court determine whether the respondent's retention or removal violated the petitioner's custody rights based on the law of the child's habitual residence, the Convention does not state which law applies with respect to the determination of the child's habitual residence. *See, e.g., Mozes*, 239 F.3d at 1071 ("Clearly, the Hague Conference wished to avoid linking the determination of which country should exercise jurisdiction over a custody dispute to the idiosyncratic legal definitions of domicile and nationality of the forum where the child happens to be removed. This would obviously undermine uniform application of the Convention and encourage forum-shopping by would-be abductors. To avoid this, courts have been instructed to interpret the expression "habitual residence" according to "the ordinary and natural meaning of the two words it contains[, as] a question of fact to be decided by reference to all circumstances of a particular case.").

[73] *Labrie*, 690 F.3d at 310 (citing *Mozes*, 239 F.3d at 1072-73; Explanatory Report ¶¶ 57-58).

[74] *Id.* (citing *Nicolson v. Pappalardo*, 605 F.3d 100, 104 & n.2 (1st Cir. 2010) (collecting cases)).

[75] *Id.*

Circuit further explained that the parents' intentions should be dispositive in situations in which "the child is so young that 'he or she cannot possibly decide the issue of residency.'"[76]

"In such cases, the threshold test is whether both parents intended for the child to 'abandon the [habitual residence] left behind.'"[77] "Absent shared intent, 'prior habitual residence should be deemed supplanted only where 'the objective facts point unequivocally to this conclusion.'"[78] "Notably, when 'the child's initial move from an established habitual residence was clearly intended for a specific, limited duration[,] … most courts will find no change in habitual residence.'"[79] "Mere retention in another country and 'private reservations' or intentions that are made 'manifest and definitive' only after the child has left its country of origin are generally insufficient to establish intent to change a child's habitual residence."[80]

"While the decision to alter a child's habitual residence depends on the settled intention of the parents, they cannot accomplish this transformation by wishful thinking alone. First, it requires an actual 'change in geography.'"[81] "Second, home isn't built in a day. It requires the passage of an appreciable period of time one that is sufficient for acclimatization."[82] "When the child moves to a new country accompanied by both parents, who take steps to set up a regular household together, the period need not be long. On the other hand, when circumstances are such as to hinder acclimatization, even

---

[76] *Id.* (quoting *Whiting*, 391 F.3d at 548-49 (citing English case that looked to parents' intentions because the child was 'two and one-half years old at the time of her abduction.").
[77] *Id.* at 310-11 (quoting *Mozes*, 239 F.3d at 1075).
[78] *Id.* at 311 (quoting *Mozes*, 239 F.3d at 1082).
[79] *Id.* (quoting *Whiting*, 391 F.3d at 549 (alterations in original)).
[80] *Id.* (citing *Nicolson*, 605 F.3d at 104).
[81] *Mozes*, 239 F.3d at 1078 (quoting *Friedrich v. Friedrich*, 983 F.2d 1396, 1402 (6th Cir. 1993)).
[82] *Id.* (internal citations and quotations omitted).

a lengthy period spent in this manner may not suffice."[83] Rather than focusing on the child's contacts in the new country, the Fifth Circuit emphasizes settled parental intent:

> A more difficult question is when evidence of acclimatization should suffice to establish a child's habitual residence, despite uncertain or contrary parental intent. Most agree that, given enough time and positive experience, a child's life may become so firmly embedded in the new country as to make it habitually resident even though there [may] be lingering parental intentions to the contrary. The question is how readily courts should reach the conclusion that this has occurred. Since the Convention seeks to prevent harms thought to flow from wrenching or keeping a child from its familiar surroundings, it is tempting to regard any sign of a child's familiarity with the new country as lessening the need for return and making a finding of altered habitual residence desirable. Further, some courts regard the question whether a child is doing well in school, has friends, and so on, as more straightforward and objective than asking whether the parents share a "settled intent." Despite the superficial appeal of focusing primarily on the child's contacts in the new country, however, we conclude that, in the absence of settled parental intent, courts should be slow to infer from such contacts that an earlier habitual residence has been abandoned.[84]

As E.E. and P.E. were only three years old at the time of removal, the Court finds that its inquiry as to their habitual residence depends solely on the parents' intentions.[85] The Court need not determine E.E. and P.E.'s habitual residence before they moved to the Cayman Islands.[86] Even assuming the children were at one point habitually resident in Russia, it is undisputed that there was a clear meeting of the minds between Mr. and Ms. Eubanks to abandon Russia as the children's habitual residence.[87]

As a result, the issue in this case is whether the parties mutually intended to establish the Cayman Islands as the children's habitual residence. It is Mr. Eubanks'

---

[83] *Id.* citations omitted).

[84] *Id.* at 1078-79.

[85] In addition, even if E.E. and P.E. were old enough to develop an opinion with respect to residency, neither party has presented any evidence regarding the children's intentions.

[86] The Court need not and does not determine whether E.E. and P.E. were habitual residents of a city in the United States or Russia, or whether the children had no habitual residence, at the time the family decided to move from Russia to the Cayman Islands.

[87] *See Delgado v. Osuna*, 837 F.3d 571, 578 (5th Cir. 2016) (citing *Larbie*, 690 F.3d at 310-11).

burden to prove this by the preponderance of the evidence. The fact that the parties had a shared intent to leave Russia is of no consequence to this inquiry, as the Fifth Circuit has explicitly held that the shared intent to abandon a habitual residence and move somewhere new does not require that the parents must agree on the new country of residence.[88] Further, the Fifth Circuit has noted "it is possible for a young child to have no habitual residence when there is no evidence of a shared intention for the child to be settled in any particular location."[89]

At trial, the parties offered conflicting testimony regarding whether they intended to establish a habitual residence in the Cayman Islands. Ms. Eubanks testified that she agreed to the move only because Mr. Eubanks told her the move to the Cayman Islands would be temporary. Ms. Eubanks introduced evidence that Mr. Eubanks continued to seek employment in the United States after the parties moved to the Cayman Islands. Her sister, Indra Ozols, testified that Mr. Eubanks applied for jobs after moving to the Cayman Islands and that he told her the move to the Cayman Islands was temporary and his family would be moving as soon as he found another job on the mainland. Ms. Eubanks testified that the parties specifically required that an "escape-clause" be included in the rental agreement for their condominium so that the parties would be able to break their lease, without penalty, when Mr. Eubanks received a position in the United States. Ms. Eubanks also testified that in June, after Mr. Eubanks accepted the position as Acting Dean, the parties looked to purchase a home in order to reduce monthly expenses, but that the parties would only purchase a house on the water so that it could either be rented or sold relatively quickly. Ms. Eubanks testified that the parties did not purchase a home because

---

[88] *Id.* at 579.
[89] *Berezowsky v. Ojeda*, 765 F.3d 456, 467 (5th Cir. 2014) (citing *Delvoyle v. Lee*, 329 F.3d 330, 334 (3d Cir. 2003)).

they could not find property in their price range that fit this criteria. Although both parties testified that they took affirmative steps to purchase a home in the Cayman Islands, this fact alone is not dispositive to the Court's habitual residence analysis.[90] The Court finds that Ms. Eubanks has put forth credible reasons as to why the parties may have considered purchasing a home despite their intention to leave the Cayman Islands as soon as Mr. Eubanks received a job offer in the United States. Although Ms. Eubanks testified that the children were registered for school in the Cayman Islands but had not yet started, Ms. Eubanks also testified that both she and Mr. Eubanks wanted E.E. and P.E. to be raised and educated in the United States. Evidence that the children were enrolled to start school in the Cayman Islands is not substantial evidence that the parties intended to remain in the Cayman Islands indefinitely. Any family with school-aged children would seek to enroll their children in school, regardless of their intended length of stay in a new location. Ms. Eubanks also testified that Mr. Eubanks told her he was not content with his job in the Cayman Islands and that Mr. Eubanks often complained that the job was beneath his qualifications.[91]

At trial, Mr. Eubanks testified that he never said the job was beneath his qualifications. He also testified that he was satisfied with his job, and that he stopped looking for other employment opportunities after the family moved to the Cayman Islands. Mr. Eubanks testified that the escape clause in the parties' rental agreement was

---

[90] *See, e.g., Panteleris v. Panteleris*, 30 F. Supp. 3d 674, 686-87 (N.D. Ohio 2014) *aff'd*, 601 F. App'x 345 (6th Cir. 2005) ("That the couple may have planned to purchase a house sometime in the future does not suggest an intent or consent to remain permanently, during the time period at issue. . . . This does not imply consent or acquiescence for the children to reside permanently in Ohio.").

[91] Ms. Eubanks' testimony that Mr. Eubanks was not content with his job is credible. He was teaching freshman English prior to June 2016 despite the fact that his Ph.D. is in Russian and Slavic Languages. Ms. Eubanks' testimony was also corroborated by the testimony of Mr. Eubanks' mother, Carolyn DeLoache, who testified that Mr. Eubanks did not like his job until he was offered the position of Acting Dean in June 2016. Testimony of Carolyn DeLoache. At trial, Ms. Eubanks' sister, Indra Ozols, testified that Mr. Eubanks told her he hated his job in the Cayman Islands and that the job was beneath him.

included so that the parties could break their lease without penalty when they found a home to purchase. Although Mr. Eubanks testified that the parties intended to stay in the Cayman Islands, he admitted at trial that, after the parties decided to leave Russia, he applied to approximately ninety different positions, almost all of which were in the United States. Although Mr. Eubanks admitted he accepted the job in the Cayman Islands because it was the only job offer he had received at the time, Mr. Eubanks also testified that he stopped looking for other job opportunities, "cold turkey," as soon as the parties moved to the Cayman Islands in January 2016.

Although Mr. Eubanks unequivocally testified that he did not actively seek other employment while living in the Cayman Islands, the untimely produced emails prove his testimony clearly was not true. [92] Included in these emails were countless communications between Mr. Eubanks and potential employers during 2016, including the State Department. Mr. Eubanks continued his quite active search for employment in the United States after he, Ms. Eubanks, and their children moved to the Cayman Islands. The emails corroborate Ms. Eubanks' testimony that Mr. Eubanks was very actively pursuing a position with the State Department while in the Cayman Islands. Despite Mr. Eubanks' testimony that he was happy with his current employment and that he intended to stay in the Cayman Islands, the untimely produced emails show that Mr. Eubanks had continued communication with the State Department both shortly before and after the two day trial.

The Court finds that Mr. Eubanks has failed to meet his burden of proof by a preponderance of the evidence that he and Ms. Eubanks had a shared intent to establish

---

[92] *See* Court Exs. 2, 3.

the children's habitual residence in the Cayman Islands. As a result, Mr. Eubanks has failed to prove by a preponderance of the evidence that the children were habitually resident in the Cayman Islands at the time they were removed by their mother. This finding, alone, is dispositive of Mr. Eubanks' complaint.[93]

## V. ATTORNEY'S FEES

Both parties requested attorneys' fees and costs in their respective pleadings.[94] ICARA provides that petitioners may be required to bear "the costs of legal counsel or advisors, court costs incurred in connection with their petitioners, and travel costs for the return of the child involved and any accompanying persons," but the court must order the respondent to pay petitioner's fees, costs, and certain expenses if the court orders the return of the child, unless the respondent establishes that fee-shifting would be clearly inappropriate.[95] "The statue does not authorize a court to order a petitioner to pay respondent's fees and costs if the court does not order the return of the child."[96] Accordingly, because the Court is not ordering the return of the children to the Cayman Islands, the parties will bear their own fees and costs incurred in this matter.

## CONCLUSION

**IT IS ORDERED** that Mr. Eubanks' Verified Complaint for Return of Children to the Cayman Islands[97] is **DENIED**.

---

[93] Because the Court has determined that Mr. Eubanks has not satisfied his burden of proving by a preponderance of the evidence that the children, at the time of their removal, were habitually resident in the Cayman Islands, the Court need not address whether one of the narrow exceptions to the return of the children to their habitual residence applies.

[94] R. Docs. 1 at 11, 18 at 11.

[95] 22 U.S.C. § 9007(b).

[96] *See Gonzalez v. Pena*, 194 F. Supp. 3d 897, 903 (D. Ariz. 2016) (citing *Jaksic v. Serif*, 2014 WL 6685375, at *6 (D. Ariz. Nov. 26, 2014)).

[97] R. Doc. 1.

**IT IS FURTHER ORDERED** that the Court's February 24, 2017 Order requiring that E.E. and P.E. not be removed from the Eastern District of Louisiana is hereby **VACATED.**[98]

**IT IS FURTHER ORDERED** that the parties' respective request for attorneys' fees and costs are **DENIED**.

New Orleans, Louisiana, this 31st day of July, 2017.

_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[98] Ms. Eubanks may pick up the children's passports from Judge Morgan's chambers at her earliest convenience.